# IN THE COURT OF APPEALS OF IOWA

No. 14-0132
Filed February 11, 2015

**SANDRA L. BENSON and WILLIAM D. BENSON,**
    Plaintiffs-Appellants,

**vs.**

**13 ASSOCIATES, L.L.C.,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.

An employee who was injured at her workplace appeals the district court's grant of summary judgment in her tort action against her employer's landlord. **REVERSED AND REMANDED**.

Bruce H. Stoltz of Stoltz & Updegraff, P.C., Des Moines, for appellants.

Richard A. Stefani and Thomas F. Ochs of Gray, Stefani & Mitvalsky, P.L.C., Cedar Rapids, for appellee.

Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

Sandra Benson was injured when a light fixture fell on her upper back and neck while she was working in a space owned by 13 Associates, L.L.C., and leased to her employer, Genesis Communications, Inc. The district court granted 13 Associates' motion for summary judgment, concluding the landlord owed no duty to Benson. The court relied on the general rule stated in *Van Essen v. McCormick Enterprises Co.*, 599 N.W.2d 716, 720–21 (Iowa 1999) that a landlord who is not a possessor is not liable for injuries sustained by the tenant or third parties on the property.[1]

We find two circumstances in this case to justify the imposition of a duty of care. First, 13 Associates retained control over Benson's workspace because of the unusual lease arrangement where 13 Associates did not demise a specific portion of the property to Genesis, but instead reserved the right to impose a definite demarcation if additional tenants moved in. Second, although Genesis agreed in the lease to take the property "as is," 13 Associates agreed to keep the structural parts of the building (including the ceiling and the lighting) in good repair. By taking on that contractual responsibility, 13 Associates owed a duty of

---

[1] Tracking the analysis in *Van Essen*, the district court embraced concepts from the Restatement (Second) of Torts [hereinafter Restatement (Second)] to support its summary judgment ruling. Because the district court did not cite the Restatement (Third) of Torts: Liability for Physical & Emotional Harm (2010) [hereinafter Restatement (Third)] and Benson first argued the Restatement (Third) on appeal, 13 Associates challenged error preservation in its brief. During oral argument, 13 Associates asserted the outcome of the case would be the same regardless of which Restatement we used to frame our analysis. Because our supreme court has suggested the duty calculus may include reference to both the Restatement (Second) and the Restatement (Third), we consider both sources in reaching our conclusion. *See McCormick v. Nikkel & Associates, Inc.*, 819 N.W.2d 368, 371–78 (Iowa 2012).

3

reasonable care to Benson. Because this suit involves a landlord who retained control over the premises and contracted to keep the lighting structures in good repair, we find it does not fall into the category of cases where no duty exists. Accordingly, we reverse the grant of summary judgment and remand for trial.

## I.  Background Facts and Proceedings

### A.  Commercial Landlord and Tenant Relationship

In 2006, 13 Associates bought a 30,000 square foot unoccupied space in Thunder Ridge Mall in Cedar Falls. The space had once housed a supermarket but had been vacant for years. 13 Associates, acting through Jim Benda of Lockard Realty, first leased the premises to Clark Enterprises.

In a July 2007 notice of termination, Clark advised Benda of its complaints about the premises, including the dilapidated ceiling structure and broken fluorescent lights on the floor. Clark employees took photographs of the conditions. At the time of the complaints, Benda inspected the premises and also took photographs.

13 Associates found another tenant the following summer. Genesis, which did business as Phantom EFX, needed a space for its employees to assemble and disassemble videogames. During the flooding in June 2008, Genesis was forced out of its warehouse building and sought to relocate, but only temporarily because it was in the process of building a new warehouse. Genesis hoped to move into the new warehouse in December 2008 or January 2009. Genesis managers viewed potential properties through Lockard Realty agent Brady Gruhn.

As a part of the lease negotiations, Gruhn issued a non-binding letter of intent to Benda, the representative for 13 Associates. The letter stated: The "terms and conditions under which [Genesis] propose[s] to lease the . . . location are as follows":

> **Structure and Mechanicals:** Prior to lease commencement, Landlord at his/her sole expense, shall make in good and safe working order all roof, structure, ceiling, floors, lighting, sprinklers, doors, loading docks, dock levelers, HVAC, electrical, gas and any other mechanicals or utilities, and shall guarantee the same to remain in good working order during the entire term that [Genesis] occupies the space. Repair or replacement costs as necessary shall be borne by the Landlord. Failure to do so at any point during the lease shall allow the Tenant, at Tenant's choosing, to terminate this lease and vacate the premises or be entitled to free rent until such repairs are completed.

> **Improvements:** Demising of this space to not less than 15,000 SF for Tenant use, including exclusive use of the loading docks, prior to and during the lease term shall be at the Landlord's choosing and expense. Tenant shall be granted the right to make alterations to the space at their expense with Landlord approval not to be unreasonably withheld.

Finally, the letter provided that upon signing, 13 Associates "will immediately move forward and prepare a lease agreement according to the terms above." Louis Weiner agreed to and signed the letter of intent on behalf of 13 Associates.

After Weiner signed the letter of intent, Benda's assistant prepared the lease and, according to Benda, she was to incorporate the letter-of-intent terms into the lease. Benda reviewed the proposed lease and sent it to 13 Associates for approval. Thereafter, on July 18, 2008, representatives from 13 Associates and Genesis signed the short-term lease.[2] Under the lease, Genesis rented

---

[2] The lease term ran from July 21, 2008 to February 28, 2009, with an automatic conversion to a month-to-month lease term thereafter.

15,000 square feet for its operations; 13 Associates did not demise the area Genesis would occupy within the 30,000 square feet. Specifically, lease paragraph 19 stated: "Landlord will not demise space unless another tenant will be leasing the remaining space." The lease's property insurance clause recognized Genesis was not utilizing the full 30,000 square feet: "Landlord and Tenant agree to insure their respective real and personal property for the full insurable value." The lease also addressed responsibility for repairs:

**5. Care and Maintenance**.
(a) Tenant takes the premises as is, except as herein provided.
(b) Landlord shall keep the following in good repair: roof, structure, ceiling, floors, lighting, sprinklers, doors, loading docks, dock levelers, HVAC, electrical gas, and any other mechanicals or utilities. Landlord shall not be liable for failure to make any repairs or replacements unless Landlord fails to do so within a reasonable time after written notice from Tenant.
(c) Tenant shall maintain the premises in a reasonable safe, serviceable, clean and presentable condition, and except for the repairs and replacements provided to be made by the Landlord in subparagraph (b) above, shall make all repairs, replacements and improvements to the premises, including all changes, alterations or additions ordered by any lawfully constituted government authority directly related to the Tenant's use of the premises. Tenant shall make no structural changes or alterations without the prior written consent of the Landlord. [Tenant agrees to remove snow and ice from the sidewalk].

Benda, the leasing representative for 13 Associates, testified the provisions in the letter of intent relating to the landlord's agreement to make the ceiling and lighting in "good and safe" order *prior to* commencement of the lease were incorporated into the lease through paragraph 5. Benda also testified he believed the property was, in fact, in good and safe repair, though he equivocated by saying: "Good repair's a relative term. What you suggest is good

repair someone else may not. As a warehouse property, I'd say, yes, it functioned well."

Before moving in, Genesis asked 13 Associates to repair the dock plates. Benda testified the dock was available for use by all tenants of the building. Genesis made its own arrangements with the utility company to run a cable line in the building for an internet connection. It is undisputed that after "Genesis moved into the space, [it] did not make any request for electrical work in the building, lighting or ceiling in the leased space."

Genesis management selected an area totaling 15,000 square feet and occupied it. The Genesis rental space was not separated by walls from the remaining 15,000 square feet. According to Chris Ollendieck of Genesis, his company arranged eight-foot banquet tables against the wall and shorter tables "coming out to make an L" so the employees could assemble the games at their tables and then stack the finished product against the wall to be packaged at the end of the day. After initially moving in, Genesis decided to reconfigure its work space to another location inside the facility, and 13 Associates did not object.

During the Genesis tenancy, 13 Associates leased a portion of the premises to a small store, resulting in a solid wall being built to separate the Genesis space from the retail space. Ollendieck testified Genesis had to move its operation to accommodate the new tenant: "I had to move—basically, we rented 15,000 square foot. And so we just rearranged our 15,000 square foot so that they would have the room to put their store in and then put their storage unit [in]." Construction workers, who were not hired by Genesis, came in to construct

walls to demarcate the new tenant's rental space while Genesis was occupying the building.

About one month into the lease, on August 22, 2008, Benson was sitting at her Genesis workstation located under a drop ceiling.[3] The light fixtures over her table had never functioned and no one at Genesis had ever asked "Benda or anyone else at Lockard Realty to see if the lights could be turned on." On his way to the restroom located on the mezzanine level of the building, Benson's coworker, Neil Price, "nonchalantly" pushed on a low-hanging ceiling support bracket. Price then heard a series of crashes and discovered several light fixtures had fallen from the drop ceiling. One of the light fixtures supported by the ceiling brackets struck Benson's neck and back, knocking her flat on the table. Benson alleges she suffered serious injuries as a result of being struck.

## B. Prior Proceedings

In 2010 Benson[4] filed suit against 13 Associates, seeking recovery under "theories of negligence and breach of [13 Associates'] duties under the terms of the lease." Benson claimed 13 Associates, her employer's landlord, owed her a duty based on the following acts: (1) agreeing in the lease to repair or make safe numerous items, including the ceiling and lighting, before the tenant took possession as shown by the letter of intent; and (2) retaining control of the premises by leasing 15,000 square feet to Genesis, but failing to specifically

---

[3] The lighting and drop ceiling above Benson's work space were installed by a previous owner and not by 13 Associates.
[4] The petition included a claim for loss of consortium by Benson's husband, William D. Benson. For convenience, we refer to the two plaintiffs in the singular.

8

demise any specific area and reserving an ongoing right to change the Genesis location if space were leased to other tenants.

13 Associates moved for summary judgment, alleging it owed no duty of care to Benson. 13 Associates pointed out the lease specified Genesis took the premises "as is." Thus, its obligation to repair or replace an existing condition arose only if Genesis gave it written notice of the repair need, and Genesis gave no notice to repair the ceiling or lights. Further, 13 Associates claimed it did not maintain sufficient control of the premises for a duty to be imposed on it as a "possessor" because "once Genesis took possession of the leased premises, Genesis was in control of the premises."

The district court agreed with the arguments advanced by 13 Associates and granted summary judgment. Benson appeals.

## II. Scope and Standards of Review

We review the grant of summary judgment for correction of legal error. *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012). Summary judgment is appropriate if the record reveals no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *see Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012). We view the record in the light most favorable to the nonmoving party, here Benson. *See Minor v. State*, 819 N.W.2d 383, 393 (Iowa 2012).

"Whether a duty arises out of a given relationship is a matter of law for the court's determination." *Nikkel*, 819 N.W.2d at 371; *see Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013) ("While summary adjudication

is rarely appropriate in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court's determination.").

In addition, interpretation of a lease is a legal issue that can be decided as a matter of law by the court, unless the interpretation depends on extrinsic evidence. *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 726 (Iowa 2014). The construction of a contract, that is the process of deciding the effect of the words used, is always reviewed as a legal issue. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008).

## III. Did 13 Associates owe a duty of care to Benson given the provisions of the lease entered with her employer?

A negligence claim is actionable if the plaintiff can establish four elements: (1) the existence of a duty to conform to a standard of conduct to protect others, (2) a failure to conform to that standard, (3) proximate cause,[5] and (4) damages. *Nikkel*, 819 N.W.2d at 371 (citing *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009)). The instant case turns on the first element—whether 13 Associates owed Benson a duty of care.

To determine whether 13 Associates had a duty to protect Benson from the falling light fixture, we examine two factors: the relationship between the parties and public policy. *See Nikkel*, 819 N.W.2d at 371 (explaining after *Thompson*, a third factor, foreseeability of the harm, should be not be considered

---

[5] The drafters of the Restatement (Third) refer to proximate cause as scope of liability and address that concept separately from factual cause. *See Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 498 (Iowa 2014).

as part of the duty analysis, but only to decide if the defendant failed to exercise reasonable care).

Under the Restatement (Third) framework our supreme court adopted in *Thompson,* actors ordinarily have a duty to exercise reasonable care when their conduct creates a risk of physical harm. *See* Restatement (Third) § 7(a), at 77 (2010). But "[i]n exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification." *Id.* § 7(b), at 77. Courts find the countervailing principles or policies warranting denial of liability in a particular class of cases in "legislative enactments, prior judicial decisions, and general legal principles" as articulated in the Restatements of Torts. *See Van Essen*, 599 N.W.2d at 718–19; *see also Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 696 (Iowa 2009) (relying on section 413 of Restatement (Second) to conclude employers of independent contractors owed only a limited duty of care to the member of the household of the employee of the independent contractor).

As a starting point, both Benson and 13 Associates recognize a "countervailing principle" in our case law warranting denial of liability for landlords, namely, "the general rule that the lessor is not liable to the lessee, or to others on the land, for injuries occurring after the lessee has taken possession, *even though such injuries result from a dangerous condition existing at the time of the transfer.*" *See Van Essen*, 599 N.W.2d at 719–20 (citing Restatement (Second) § 356 cmt. *a*, at 240 (1965)) (emphasis added). The policy behind this

rule is that the lessee becomes "for the time being the owner and occupier, subject to all of the liabilities of one in possession." Restatement (Second) § 356 cmt. *a*, at 240. The guiding maxim repeated in our case law is "liability is premised on control." *See Nikkel*, 819 N.W.2d at 372 (citing *Van Essen*, 599 N.W.2d at 720 n.3 (quoting *Allison by Fox v. Page*, 545 N.W.2d 281, 283 (Iowa 1996)).

Benson argues the general rule does not apply to her situation for two reasons: (1) 13 Associates retained control over the premises leased to Genesis because the lease did not demise a specific portion of the overall property; and (2) 13 Associates agreed in the lease to keep the lighting fixtures in "good repair" and had notice of defects before transferring the property to Genesis.

Before we address Benson's arguments, we detour to consider whether our supreme court's adoption of the duty formulations in the Restatement (Third) requires an updated duty analysis in the case of commercial landlords. Beyond the general duty provisions in section 7, section 40 of the Restatement (Third) discusses duties based on special relationships. *See generally Hoyt*, 829 N.W.2d at 776 (analyzing duty of tavern owners to exercise reasonable care under section 40 of the Restatement (Third)). "An actor in a special relationship with another owes a duty of reasonable care with regard to the risks that arise within the scope of the relationship." Restatement (Third) § 40(a), at 39. Special relationships giving rise to the duty in subsection (a) include "a landlord with its tenants." *Id.* § 40(b)(6). "The affirmative duty imposed by this Section applies to common areas and other areas of the premises over which the landlord has

control." *Id.* § 40, cmt. *m.* "The circumstances of a commercial lease might affect the degree of care reasonably expected of the landlord, indeed might even effect the existence of a duty . . . ." *Id.*

Furthermore, the duty of lessors, "some of which derive from the lessor's retained possession of portions of the leasehold" and some of which are drawn from the section 7 ordinary duty of reasonable care for conduct creating risks to others, are comprehensively set forth in section 53, which "includes all of the tort duties to which lessors are subject." *Id.* § 53, cmt. *a*, at 321–22. Significantly, comment *a* to section 53 explains that this section "supersedes and replaces" sections 355 to 362 of the Restatement (Second).

The Restatement (Third) "eschews the earlier approach" of the first two Restatements, which had provided "lessors were not generally subject to tort liability for conditions on the leased premises." *Id.* at 322. Recognizing the "broad no-liability rule of the first two Restatements" had been moderated by those Restatements "providing a number of exceptions," the new approach in the Restatement (Third) "instead sets forth the positive bases for a lessor's duties to those who suffer harm on the leased premises." *Id.* The new framework in section 53 states, in relevant part:

> [A] lessor[6] owes to the lessee and all other entrants on the leased premises the following duties:
> (a) a duty of reasonable care under § 51[7] for those portions of the leased premises over which the lessor retains control;

---

[6] A lessor is a "land possessor" who, pursuant to an agreement, "provides possession of some or all portions of real property to another for a term." Restatement (Third) § 53, cmt. *b*, at 322.

[7] Restatement (Third) section 51, at 242, "General Duty of Land Possessors," provides:

(b) a duty of reasonable care under § 7 for any risks that are created by the lessor in the condition of the leased premises;

(c) a duty to disclose to the lessee any dangerous condition that satisfies all of the following:

(1) it poses a risk to entrants on the leased premises;

(2) it exists on the leased premises when the lessee takes possession;

(3) it is latent and unknown to the lessee; and

(4) it is known or should be known to the lessor;

. . . .

(e) a duty of reasonable care:

(1) for any contractual undertaking; or

(2) for any voluntary undertaking . . . .

We recognize the presumptions regarding the existence of a duty for landlords have shifted from the Restatement (Second) (presuming no duty and recognizing exceptions) to the Restatement (Third) (eliminating no-duty presumption and describing affirmative duties). But the concepts of retaining control and contracting to keep the property in good repair arise in both Restatements. These concepts fall within our path whether we approach them as positive bases for the landlord's duty or as exceptions to the lack of landlord liability. Accordingly, we focus our duty analysis on the relationship between the landlord and Benson and the public policies reflected in our case law concerning relative responsibilities for safety on leased property. *See Nikkel*, 819 N.W.2d at 374 (finding electrical subcontractor who transferred control to owner of work site had no duty to employee of the owner because "party in control of the work site is

---

[A] land possessor owes a duty of reasonable care to entrants on the land with regard to: (a) conduct by the land possessor that creates risks to entrants on the land; (b) artificial conditions on the land that pose risks to entrants on the land; (c) natural conditions on the land that pose risks to entrants on the land; and (d) other risks to entrants on the land when any of the affirmative duties of Chapter 7 is applicable.

best positioned to take precautions to identify risks and take measures to improve safety").

### A.      Retained Control by Failing to Demise Specific Space

The district court concluded 13 Associates did not retain control over the 15,000 square feet leased by Genesis, and therefore Genesis had sole control of the area it leased and the space where Benson worked.  From that conclusion, the court ruled 13 Associates had no corresponding duty of care to Benson because it was not a "possessor" of the area Genesis leased.

Benson contends 13 Associates did retain control of the premises by virtue of the unusual nature of the leasing agreement.  13 Associates owned 30,000 square feet in Thunder Ridge Mall and leased half of it—15,000  square feet—to Genesis.  But the lease did not delineate which 15,000 square feet Genesis was to occupy.  The lease provided: "Landlord will not demise space unless another tenant will be leasing the remaining space."  The lease did not place a limit on how many times 13 Associates could require Genesis to move as 13 Associates acquired new tenants.  Benson argues the lease afforded 13 Associates an ongoing ability to change the Genesis work location, including leasing the space Genesis occupied to another tenant.

It is undisputed Genesis resituated on its own accord on one occasion.  It is also undisputed 13 Associates acquired a new retail tenant and subsequently demised a specific 4000 square feet to the new tenant.  When it acquired the new tenant, 13 Associates required Genesis to move its operations out of the area demised to the new tenant and into a different portion of the building.

Even given those facts, 13 Associates denies retaining control over the space Genesis leased because it "did not determine the area Genesis occupied" and "Genesis defined its own space." According to 13 Associates, the subsequent lease to the new tenant "did not interfere with Genesis' operation, except to require some 'rearrangement' of its work area." Thus, "the district court correctly ruled there was no evidence that the absence of specific parameters defining where Genesis could operate meant 13 Associates retained joint control over the area Genesis chose to occupy."

We must decide whether the landlord's ongoing authority to reconfigure the space leased by Genesis constituted a condition of retained control that would generate a duty of care. *See* Restatement (Third) § 53(a), at 320; Restatement (Second) § 360, at 250. 13 Associates cites to *Van Essen*, 599 N.W.2d at 719, and *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 814 (Iowa 1994), for the proposition that a duty of care turns not on ownership, but on occupation and control of the property. While that proposition is undoubtedly true, 13 Associates' situation is distinct from the absentee owner of rental property discussed in those cases.

Benda, the leasing representative for 13 Associates, testified Genesis paid rent for 15,000 square feet, but initially had access to the entire 30,000 square feet. Benda agreed Genesis "may or may not have used all of that area." Benda further testified that even when 13 Associates acquired the new tenant, Genesis was not assigned a certain area: "The store may have gotten taken out of that space, but we never demised a 15,000 square feet for Genesis' use." He

testified: "Genesis still had all this space in which to function. We never measured their space." Given these undisputed facts, Genesis and 13 Associates exercised joint control over the premises. Genesis had access to the entire 30,000 square feet owned by 13 Associates. And 13 Associates was able to offer any portion of the area occupied by Genesis to a new tenant, which belies the landlord's claim that Genesis had sole control of its workspace. In fact, the summary judgment record suggests the landlord sent workers into the warehouse to build walls to accommodate a new tenant during the pendency of lease with Genesis.

The district court concluded the landlord had no duty to Benson because she "was not injured in an area within the landlord's possession" but rather in an area selected by and leased to Genesis. Because Genesis was entitled to use the entire 30,000 square feet, and 13 Associates retained the ability to lease any part of Genesis's selected work space to new tenants, we conclude a material question of fact exists as to whether Benson was injured in an area subject to joint control. We find *Knapp v. Simmons*, 345 N.W.2d 118 (Iowa 1984) instructive on the issue of joint control. In that case, the tenant paid rent for corn acres on the landlord's farm, but the tenant's cattle had the run of the entire farm. *Knapp*, 345 N.W.2d at 124. Because the supreme court was "left in the dark about the landlord's retention of control," the court reversed the grant of the landlord's motion for summary judgment. *Id*. The summary judgment record in the instant case does not show 13 Associates ceded control of a specific leased

space to Genesis. Accordingly, 13 Associates cannot prove as a matter of law that it owed no duty of care to Benson in the area where the light fixtures fell.

Although this ground for reversing the summary judgment ruling would be dispositive, we choose to address Benson's second claim as well.

### B. Contract to Keep Leased Property in Good Repair

In granting summary judgment for 13 Associates, the district court rejected Benson's argument that the landlord undertook a contractual duty of reasonable care by agreeing in the lease to keep the ceiling and lighting in good repair. The district court recognized a landlord can expose itself to liability by contractually agreeing to make repairs, citing Restatement (Second) section 357(a), at 240. But the court further noted the contract defined the extent of the duty. *See* Restatement (Second) § 357, cmt. *d*, at 242. The court then focused on the "as is" clause of the lease with Genesis. The court decided "the contract specifically indicated that the tenant, Genesis, took possession of the facility in the state it was presented, and the undisputed facts indicated that Genesis presented no reservations regarding the state of the ceiling." The court interpreted the lease to say: "13 Associates did not contract to ascertain the need for repairs, only to conduct repairs upon notice from Genesis."

Benson contends the district court misinterpreted the relative obligations of the landlord and tenant under the lease because the court overlooked their signed letter of intent. Specifically, the letter stated that before the lease started, the landlord was to "make in good and safe working order" a number of structural elements of the property, including the ceiling and lighting, and was to guarantee

that those elements remained "in good working order" while Genesis occupied the space. In the actual lease, the landlord agreed to "keep" in "good repair" the same list of structural items, including the ceiling and lighting.

Benson directs our attention to Restatement (Third) section 53(c) and (e). Subsection (c) discusses a lessor's duty to disclose any dangerous condition that existed when the lessee took possession, was latent and unknown to the lessee, and was known or should have been known to the lessor. Restatement (Third) § 53(c), at 320. Subsection (e)(1) assigns the lessor a duty of reasonable care for any contractual undertaking. *Id.* § 53(e) at 321. Benson asserts that, before the lease with Genesis commenced, 13 Associates had knowledge of the dangerous condition of the lighting or should have known based on communication to 13 Associates from April Duffner, who worked for the earlier tenant, Clark Enterprises. Duffner advised Benda of the "deplorable condition" of the property and documented it with photographs depicting broken fluorescent bulbs on the floor and a portion of the drop ceiling that had fallen. Benson argues in light of these principles, the district court erred in concluding, as a matter of law, that 13 Associates had no duty to protect her.

13 Associates contends the non-binding letter of intent did not create any duties on its part. The landlord argues unambiguous language in the lease required Genesis to give 13 Associates notice before a duty arose to repair or replace lighting and Genesis never gave such notice. As for its knowledge of the dangerous condition based on reports from tenant Clark, 13 Associates contends

a landlord's duty to disclose has no application to this case because the issue is one of control.

"Because a lease is a contract, we apply ordinary contract principles to determine its meaning and legal effect." *Alta Vista Props.*, 855 N.W.2d at 727. We consider the language of the lease as well as any pertinent extrinsic evidence offered in the summary judgment proceedings. *See id.* We determine meaning and ambiguity in light of "the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.* The most important evidence of the parties' intent remains the words of the agreement. *Id.*

Based on the undisputed evidence, we agree with Benson that the letter of intent is probative of what Genesis and 13 Associates contemplated at the time their representatives signed the short-term lease. *See Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 432–33 (Iowa 1984) (authorizing consideration of communications between the parties as an aid to contract interpretation). Benda, the agent for 13 Associates, testified his assistant would look at the letter of intent signed by both the tenant and landlord "and prepare a draft based on those terms negotiated in a letter of intent." In this case, the lease provisions followed naturally from the terms negotiated in the letter of intent. 13 Associates agreed to make the lighting and ceiling in "good and safe working order" in the letter and agreed to keep it in "good repair" in the lease language.

Given these signals of intent, we respectfully disagree with the district court's view that the as-is clause overrides the keep-in-good-repair clause. Under the lease, the tenant took the premises "as is, *except as herein provided.*" (Emphasis added.) The next clause in the lease provided that the landlord would "keep" the structural parts of the building in "good repair." The following sentence stated the landlord was not liable for failure to make any repairs or replacements unless the landlord fails to act within a reasonable amount of time after written notice from the tenant.[8]

When we consider the preliminary negotiations of the landlord and tenant, we conclude their mutual intent when signing the lease was for 13 Associates to ensure the structural aspects of the building, including the ceiling and lighting, were in safe condition before the lease commenced. The lease language required 13 Associates to "keep" the structure in "good repair." Under these circumstances, the lease requirement of written notice from the tenant did not refer to pre-existing dangerous conditions, hidden from the tenant, but known to the landlord at the commencement of the lease. *See Wright v. Peterson*, 146 N.W.2d 617, 620 (Iowa 1966) (recognizing landlord liability where injury was caused by hidden or latent defects which existed at the time the lease was consummated and the defects were either known or should have been known to the landlord through the exercise of reasonable care). In our view, the keep-in-

---

[8] In considering a virtually identical care-and-maintenance clause in an Iowa lease, a federal district court noted "the incongruity of this language," but found it unnecessary to resolve the incongruity in denying a landlord's motion for summary judgment. *See Swiss Colony, Inc. v. Promotion Fulfillment Corp.*, 32 F. Supp. 2d 1088, 1092 (S.D. Iowa 1998).

good-repair language of the lease created a contractual obligation on the part of 13 Associates to care for the structural aspects of the rental property.

Moreover, such an obligation is consistent with long-standing Iowa law concerning landlord duties. *See Barrett v. Stoneburg*, 29 N.W.2d 420, 423 (Iowa 1947). In that case, Stoneburg argued the tenant in control of a leased building, and not the landlord, was liable for damages to third persons when the building collapsed. *Id.* The supreme court held the landlord was also liable "where the injury resulted from the permanent condition of the building (not the use thereof by the tenant) and such condition existed at the time of the lease." *Id.*

In summary, the district court erred in concluding that 13 Associates, as a matter of law, did not owe Benson a duty of reasonable care under the circumstances presented here. Accordingly, we reverse the grant of summary judgment and remand this case for trial.

**REVERSED AND REMANDED.**